May it please the Court, my name is David Tarshis. I represent the petitioner, Joseph Kulubi. I'd like to focus today on the credibility issue and on Mr. Kulubi's separation from his wife, Naomi. Before doing that, a couple of brief comments about the procedural posture of this case, that is, a grant of withholding, determination of eligibility for asylum and discretionary denial of asylum. It would help me a lot if you would just give me a little sense as to what's really going on here. We have a withholding of removal, yet a denial of asylum. So what's the net result? Does he stay, or does he have to go? Net consequence of that is that Mr. Kulubi is allowed to stay, and he has for the past several years been living in Irving, Texas, a suburb of Dallas. He's allowed to work, although not. Some jobs are reserved for citizens, but he has a job working there. But the consequences are he has less of the rights that one would have if one were granted asylum, and most significantly, he does not have the ability to have Naomi come and obtain asylum based on his having obtained asylum. That's a benefit that 1158b-3 gives to spouse and children of those who obtain asylum. It's not available for those who have withholding from removal. Did she come to visit? I am not aware of any provision allowing her to come to visit. In any event, he's not under any significant threat of deportation. He's not under a threat of deportation. What he has is a choice. If he wants to see his wife, he has to go back to Congo, where the IJ and BIA have determined he faces a more than 50 percent likelihood of being persecuted again, or if he wants to avoid persecution, he can stay here and not be able to see his wife. That's the posture that the case is in. The other note about the posture is that with regard to the discretionary denials of asylum, the IJ acknowledged that he was proceeding, as he put it, quote, at the risk of proceeding against the conventional wisdom, close quote, in denying asylum to one found eligible. He said he was not aware of cases upholding denial of asylum on a discretionary basis. I'm aware of three cases from this court that have considered such denials and reversed. Those are Andre Aysen, which is first cited on our brief at page 38, Lopez Galarza, first cited on page 17, and Castro Orion, first cited on page 40. What's our standard of review with respect to the discretionary denial? Standard of review is abuse of discretion, and that includes several points worth noting. It's pretty deferential. It's deferential subject to, as your Honor knows, this Court's history of saying that substantial evidence includes, I beg your pardon, it includes several factors. I want to say that substantial evidence includes the credibility standards that this Court has set forth, and in particular saying that the decision below must be based on factual finding and not on speculation. And as I said, credibility is the first thing I want to focus on here. So in this unusual situation where discretion, where asylum is denied as a matter of discretion, the IJ tells us the reason here. He says, and I'm on page 254 of the record, I found that the Respondent has not met his burden to persuade me that he deserves relief in the exercise of discretion because I don't believe him to have been truthful as to the extent of his activities for SNP, even though I recognize that under Ninth Circuit finding. Counsel, could the IJ have taken an adverse inference from mere membership in SNP? Could he sort of categorically, if you're a member of SNP, we're going to infer that you do, that being a member of SNP is different from being a member of the Rotary Club, and take from that, even though he didn't have any affirmative evidence of misconduct or overt participation by Mr. Colubi with SNP. Isn't that what the BIA did? Let me address both questions. I'll take the second question first. I don't believe that's what the BIA did. The BIA makes reference to membership, but it also says we find, as the IJ did, that he was, I think their term is less than forthcoming, his testimony lacked candor, and therefore denied discretion. There are two aspects of that. One, when they say we find, as the IJ did, the IJ didn't rely on membership alone. He relied on the credibility issue, not merely membership. Going back to Your Honor's first question, would that have been sufficient if the IJ had said, I've got membership here, and I'm going to draw an inference from that? I don't believe that would have been sufficient for a couple of reasons. One, I don't believe that would have been sufficient for a couple of reasons. One, the, what we know from cases like Lipenik's, that membership is not enough, and if you stack that against the other factors going the other way, the past persecution, the risk of persecution if he goes back to see his wife, the guidance from 8 CFR 16, I'm misremembering the citation, but the same thing. There's a section that says if you're going to give withholding and deny asylum, and that's going to keep families apart, you need to go back and take a close look at that, because we have a policy that families ought to be kept together. If you put those factors in the mix of, plus, excuse me, the fact that we have Mr. Kaluby's testimony that, no, I didn't do anything for SNP, and the factual determination that, no, I didn't do anything for SNP, and that, and the IJ says, if I follow the credibility standards, I give credit to that testimony, and I believe that he didn't do anything, there's no direct evidence that he did do anything. If you put those factors together, I don't think you can get to a point of saying we deny, so I submit that what's really happening here is that we're relying, is that the IJ and the BIA are relying on the adverse credibility determination. I sense that Judge Rimer has a question before I go to my next sentence. Basically, it's the same question as Judge Bybee. I'm just going to put it in a little bit different context. If you assume that the IJ and the BIA found Kaluby creditors and can't back off of that, okay, assume that, why is it unavailable to the BIA as a matter of its discretionary determination or entitlement to asylum to say membership in SNCC, no matter what Kaluby did or didn't do, membership is an adverse factor? I would say two-part answer to that question, Your Honor. The first part would be, as I indicated in my answer to Judge Bybee, that if you took membership alone as an adverse factor, but you put it alongside the other factors I just mentioned, persecution, separation, et cetera. I'm not talking now about how it weighed them. I'm just saying, isn't it okay for the BIA to say membership in that organization is an adverse factor, even though we believe that Kaluby didn't do any bad things himself? Right. I think if the BIA had said — I understand. I'm assuming that. I'm trying to get your answer to whether it's okay for them to consider just membership adverse. Yeah. If the BIA had said, we believe what he said, and let's look at the factors on this side of the ledger, can we put membership as a negative factor, I do believe that would be permissible. Question, is that what they did here? No, I don't believe they did. I think it's clear from what they said that they're relying on the improper adverse credibility determination. And if they rely on an improper factor, then that's an abuse of discretion. It doesn't matter if there might also have been some additional proper factors. And let me give a citation for that, because I don't think we have one in our brief. I direct the Court to the Virk case, 295F3rd 1055 at 1060-1061. Counsel, if you'd like us to look at that case, provide us with gum sheet references and also serve your opponent, counsel. Okay. Turning back to the credibility issue. So what we have here is a situation in which the BIA, in which, excuse me, the I.J. made and the BIA endorsed two findings at the same time. One, that if we follow the rules of substantial evidence and the law regarding credibility, we accept Mr. Kaloubi's testimony, we find that he didn't do anything to accept SNP. But at the same time, as a matter of discretion, we disbelieve that testimony and find that he did do anything. Can they make those two findings at the same time? Submit that they cannot for. Let me ask you, for the benefit of your expertise in this area, analogies. I'm afraid that if Your Honor is relying on my expertise, it will be a short answer. But go ahead. Well, it would still be longer than mine. Analogies that occur to me are permanent injunctions after a trial. Permanent injunctions being a discretionary call where you've got weighing of equities and whatever, but you are nevertheless bound by the facts as found in the trial verdict. No longer the case, but at least when I started life as a district judge, you didn't try Title VII cases to a jury. Judges made that call. But if a 1983 case were tried to a jury, you couldn't make a Title VII finding that was contradictory to the trial finding. Are there any cases that you're aware of that, by analogy, would say that a credibility  are binding on the entitlement stage? Are we really in uncharted territory? I would say, Your Honor, that I don't know of cases that fit that particular fact pattern, but I don't think we're in uncharted territory. As I said, I'm aware of three cases in which this Court considered discretionary denial following a determination of eligibility. None of those specifically considered a credibility issue, although they, in at least two of them, Andreasson and I think Castro-Orion, they acknowledged substantial evidence. Andreasson does contain a fact pattern that I think provides a helpful analogy, if I may. In that case, the issue concerned firm resettlement, whether the applicant had spent sufficient time in a third country before coming to the U.S. to not be able to get asylum. And there were regulations the law had set down saying these are the standards for determining when firm resettlement has occurred. Mr. Andreasson hadn't spent enough time in the third country to be disallowed under those rules, but the BIA said, well, we're entitled to make a discretionary decision. We can rely on whatever we want, and we're going to rely on the amount of time he spent in the third country, even though it's not enough under the guiding law. I believe that is at page 1046 of the opinion. And this Court reversed, saying to allow that would undermine the law governing firm resettlement. And similarly here, it would undermine the rules of substantial evidence and the credibility rules if you could, if the IJ and BIA could say, all right, we know we can't find him not credible under the law, but as a matter of discretion, let's put that aside. I'd like to reserve the remainder of my time. If you may do so, counsel. Did you hear from the government? Good morning. May it please the Court. My name is Andrew McLaughlin. I represent the Respondent Attorney General of the United States in this case. As the Court observed from the outset, this case is characterized by a huge issue of discretion, the discretion of that is vested in the political appliances of government almost unfettered, as has been discussed in many cases. I couldn't agree with you more. There's not any area that has greater discretion than immigration, probably, in terms of the sovereign interests of the country. But whether the same, in effect, sequential steps of a process, one can at the one hand say something is X and then turn around and say, well, something is not X. Is it different from exercising your discretion with respect to the meaning or consequences of X? Absolutely, Your Honor. And that is simply not what happened in this case. Okay. Help us out. Tell us what's going on here. Your Honor, the – let me go directly to the issue of the candor or credibility issue. And Your Honor was discussing examples of – let me throw out a couple of other examples for you. Let me specifically address the issue of a credibility determination. For example, as you're familiar with this Court's case law, if a matter of inconsistency or lack of credibility does not go directly to the asylum claim itself, then the Immigration Court and the Board of Immigration Appeals cannot reach an adverse credibility determination that goes to the total issue of eligibility and exclude an alien from admissibility based on that determination. So let's assume for a moment that the alien is caught in a bald-face lie seeking relief from an immigration judge and it doesn't go to the asylum claim. Is the immigration judge required to ignore the fact that this alien has lied to him directly in his face seeking this matter of grace from the immigration judge? The answer is absolutely not. Totally different issues. The issue of credibility in terms of the credibility determination that was made in this case, that is the alien was determined to be credible on the facts that were applicable to his asylum claim, is absolute. There is no issue associated with that. However, the alien just wasn't being forthcoming in seeking something that he should have been forthcoming in doing. I'm sorry. This escapes me how you can say that, because the immigration judge said he did not participate. I believe him. He didn't participate personally. He just went to the movies, used it for popcorn, and he used it for tax breaks. Okay? So he didn't participate. However, I actually think he did. Your Honor, that's not what the ---- And in this case, you're actually looking at the board's determination, not the I.J.'s determination. The board used its own analysis. That's what happened. And the BIA didn't bite the bullet and say we're going to reject the credibility determination of the I.J. Or did they? No. They accepted the credibility determination of the I.J., that he was, in fact, credible as it applied directly to the essence of his asylum claim, the standards that are applied by this Court. That's the problem raised by Judge Reimer. No. The issue here is whether from the manner of testimony or whatever, however you want to characterize the behavior of the alien before the immigration judge. Mr. Glockman, is the government's contention that as to those things to which Mr. Kalubi testified, he testified truthfully, but that he did not offer sufficient testimony? That is, that there are other things that he withheld from the I.J.? That is, everything that he said affirmatively was true. I have a wife. I'm 29 years old, whatever. I was persecuted. But that he withheld things? Your Honor, there's two parts to that. First of all, the immigration judge clearly had the sense that this person was not being entirely forthcoming with him. It wasn't clear whether that had anything to do with his asylum claim, just the person wasn't being entirely forthcoming with him. Well, why did he rule contrary to that, at least in the first part? In order to determine, based on this Court's case law, that an alien is not being credible with respect to his asylum claim, you have to be able to identify the particular aspects of the asylum claim that he's not being credible toward. That isn't what happened in this case. The immigration judge in this case got the sense that this wasn't really a good person. And it's partly because some of the things that the alien testified, he accepted as true. Yes, I was a member of an organization that everybody universally thinks is really bad for 10 years, and I accepted benefits as a result of that, and I presented myself as a member of that, and I never tried to get away from it, and it was all good stuff for me, and I really enjoyed my life living with all of those benefits. The immigration judge got a sense from all of that that this really wasn't the kind of person that merited a discretionary grant of asylum. Wait, there's a couple of different things that could be going on. One is that I.J. could have said, you know, I hear you telling me that you used it to go to the movies and got the tax break, and that you didn't participate in any way, you didn't provide any information to SNF, and I just don't believe it. Now, that would be just a flat-out credibility matter. Now, the question, the hypothetical that I put to you was that everything that Mr. Kaloubi testified to was true, but that Mr. Kaloubi did not testify as to everything that he knew about his participation with SNF. But that should also go to credibility, shouldn't it? Or at least the I.J. should have said at some point, Mr. Kaloubi, have you told me everything about your participation with SNF? And if Mr. Kaloubi says yes, at that point the I.J. can say, you know something? My gut tells me you're not telling me the truth. And that would be, and that also would be an adverse credibility finding. But the I.J. didn't do that. The I.J. said he's credible. That's absolutely right, Your Honor. The fact that an alien doesn't, isn't found to be uncredible with respect to the specific aspects of his asylum claim and the eligibility issue does not mean that the total sense that the immigration judge and the Board of Immigration Appeals through the record receives by reviewing the record shouldn't demonstrate, shouldn't be a factor that they may consider in the exercise of their discretion. But that makes it impossible for us to review it. How can we sort that out? Your Honor, the test in this area is pretty straightforward. If the facts are right, and the facts in this case are the immigration judge and the board specifically cite things that are true, there's not any doubt about the acceptance of the benefits or the fact that the immigration judge was feeling that this guy wasn't being forthcoming. Those are the facts that are involved. If those things are not precluded as a matter of law from the discretion of the board to consider as a matter of discretion, it is not abuse of discretion for them to do so, and the court must affirm what the board did. But it may not be an abuse of discretion, as we're talking about with counsel, for the board as a matter of discretion to say, we think membership in this organization, no matter what the members personally do, is anathema. That's all. And we don't want to do anything in this country to embrace membership in this organization. Just membership, period. I don't know why the BIA can't consider that as a factor and factor it in and balance it along with all sorts of other things. But that's very different from just sort of going, ah, well, you know, I believe him, he didn't do anything, and yet I kind of don't believe him. It is not clear from the record that that is, that those specific kinds of things, the aspects of the asylum claim are what the board and the immigration judge were   Yes, ma'am. For one moment. Yes, ma'am. I know that counsel didn't, we didn't let him get to his argument about the wife. But I do have a question about it. As I understand what happened, the BIA said, yes, we have looked at the regulation which says that we need to reconsider when asylum is denied, and the effect would be that the wife can't join her husband, and there's no third country where they could relocate. But we don't find that determinative. Now, my question to you is, is that correct? First of all, that it doesn't have to be determinative. It just has to be a factor that's balanced along with other factors, both favorable and unfavorable. And second, just saying it's not determinative, we've considered it, suffice under Rodriguez and some other cases for purposes of appellate review, because there's nothing to show the BIA wrestled at all with the fact that the wife couldn't join her husband. Maybe she could. I don't know. It didn't wrestle with it, nor did it wrestle at all with whether relocation in a third country north of Congo was possible or anything. It just didn't wrestle. Well, there's an entire series of arguments with respect to that. Fundamentally, they were required to consider the argument that was raised, and they did. They considered the regulation that was cited by the alien. The regulation merely makes it a factor. They're required to think about that, and they did think about it. And what they determined was that it didn't change where they were at. The fact that the alien wasn't going to be able to bring his spouse with status to the United States didn't change their point of view. Now, this goes back to what Judge Scanlon was referring to earlier about the distinctions between asylum and withholding and how that applies to things. I understand. My understanding is BIA is supposed to kind of come to grips with the fact that the spouse can't come. There could have been hundreds and hundreds of arguments associated with whether or not they do that. The Board is not required to address every single argument in every situation. They did consider what Mr. Kalubi raised, that is, my spouse wouldn't be able to come. The issue wasn't whether it was by itself was determinative. The issue was whether as a factor it changed their judgment. Let me point out a couple of things. Let me point out a couple of things about why, in the structure, why it might not. Now, the fact is, as a fact, they considered the facts and they considered the argument in their discretion and told you that it didn't make a difference. And you really don't need to get into extreme detail in describing in any of these things why not. In a really brilliant opinion in Rodriguez, someone who doesn't believe in disturbing discretion much wrote that, you know, we just can't tell what the BIA did or why. And that being the case, they need to just do that. That's all. We're not saying that what they did was wrong. We just need to know why they did it in order for us to be able to review the case. Why doesn't that apply to the spousal thing here? Your Honor, if that were to apply, if you got into, if you drilled into each argument and then asked, well, why did you decide that and why did you decide that, you could go on out of time. In this case, you are in a situation where the issue was considering all of the factors where do you come out as a matter of discretion. They listed the factors that they considered and they told you where they came out as a matter of discretion. It is not required for them to say in great detail why it is they came out that way. Let me suggest a few reasons. First of all, Mr. Kaluby, the provision in Section 241 of the INA, which governs withholding, was designed to not cause people to be separated as opposed to not allow people to bring their spouses over. In the structure, it was designed to not compel the government to separate people as opposed to not allow them to bring them together. Secondly, there is nothing stopping Mr. Kaluby from going to a third country and meeting his spouse in a third country. He can travel and he can even come back to the United States, nor is there anything stopping his spouse from coming to the United States as a visitor, as Justice Scanlon observed. The key to this concept is more that we're getting into this matter of grace again, that the obligation to not send somebody back to a place where they're going to be persecuted is significant and it's mandatory. It's governed by international law. We've accepted it. And that's what withholding means. We're not going to send Mr. Kaluby back to the Congo where he's going to get persecuted, period. We can send him to a third country. If the Attorney General identifies a third country that will take him, they can send him, the Attorney General can send him there. And if he wants to meet his spouse there, he can. The difference between asylum and withholding in that respect is considerable. Withholding is a limited form, although it's mandatory, it's a limited form of relief. It's a temporary form of relief. If the situation in the Congo changes, and who knows, it may even already have changed, the Attorney General could send Mr. Kaluby back to the Congo as soon as that situation has changed based on withholding. But if asylum were the case, that wouldn't be the situation. So there's a series of differences, but one of the considerable differences is if you're granted asylum, after a certain period of time and subject to numerical limitations and so on, you can adjust your status and become a lawful permanent resident of the United States and eventually become a citizen of the United States. That's a very significant matter of grace on behalf of the United States, and there's nothing mandatory about it. And to assert that Mr. Kaluby should get that benefit just because, and the reasoning why he should get that benefit is so that he could also get that matter of grace as a collateral consequence for somebody else, is simply too speculative. It's something way down in the weeds so low that it's not something the Board would have addressed in any case. Mr. McLaughlin, would you address the question of the BIA's findings with respect to his health? Yes, Your Honor. That's pretty straightforward from the point of view of the Board. The record is, as pointed out, I think it's page 30 of Respondent's Brief, is full of references saying, yes, he has medical conditions, but they're not a problem for him. He gets along just fine. He walks with a cane. He's okay. He doesn't require any significant treatment. He's not, there's nothing wrong with him. He is a person with a disability that survives just fine in any society. That's what the record reflects, the substantial evidence in the record reflects that. And there's no doubt that the Board's finding in that respect is correct. The fact that the Board didn't say, okay, he has this disability that, you know, it's the same one my father has, but became a colonel in the Army, doesn't make, just doesn't change things at all. But the fact is, good health is an accurate representation of what, of Mr. Kalibi's situation, and the Board was correct in saying so. Your Honor, the total issue here is, is really kind of simple once you get past the Once you sort through what the Board really did, there is a distinction between the concept of credibility determination and the concept of what's this person all about? Is this person meriting of a favorable exercise of discretion? And you can also see that in this separate issue of the Canadian determination. Mr. Kalibi argues in his brief that somehow the Board adopted the negative determination by Canada that the person was uncredible and therefore didn't warrant asylum. It's simply not what happened in the case. The Board is required, and it kind of illustrates the, albeit, you know, kind of nebulous and vast scope of the Board's discretion in what factors it considers and how it looks at those factors. But the Board considered the fact that Mr. Kalibi came through another country, then came to the United States, then went to Canada, then sought asylum in Canada, was denied asylum in Canada, failed to appeal his determination in Canada, and then came to the United States. And what the case law behind that reflects is what they're looking for is, is this person truly a refugee? Is this person the, is what's lurking in this person's mind the kinds of things that we're going to be granting that merit this favorable exercise of discretion? And in those circumstances, according to the, you know, the Pula case and other, and the other case law that the Board was relying on, those kinds of circumstances indicate that the favorable exercise of discretion, if there were to be one, should be in Canada. And that the fact that he subsequently came to the United States, or actually first came to the United States and didn't seek asylum here, and then subsequently came to the United States after being denied in Canada, told the Board that there was something else this guy was looking for. He wasn't just a refugee. He was looking for something specific in asylum from the United States. And in those circumstances, that is an enormously nebulous factor to be considered, and yet it's previously been upheld. And it's the kind of thing that the Board is supposed to look at to determine whether or not this act of grace, this favorable exercise of discretion, should be exercised. It shows you how broad the discretion is in the factors that are considered and the weight that the Board should give to those factors. Under those circumstances, given the breadth of that discretion, the fact that the facts employed, such as the health determination, were correct, and the fact that they didn't use any determinations that were precluded by law, this Court should affirm the decision of the Board. Thank you. Any questions? Mr. Tarshis, you have some reserve time. All right. Let me first address the question of reuniting Mr. and Mrs. Colubi in a third country. The I.J. noted here on page 253 of the record that it's virtually unheard of for another country to receive from the United States the citizen of a country that's not his own. There's no evidence in the record of some third country where Mr. and Mrs. Colubi could be reunited. The I.J. says I don't think that's likely. Here, in this country, we have the firm resettlement doctrine. If other countries have similar policies, the fact that Mr. Colubi has now been here for several years makes it all the less likely that some other country is going to take him. The choice that Mr. and Mrs. Colubi have is for him to go back to Congo, where he faces likelihood of persecution, to be with her, or for him to be here and either obtain asylum in further proceedings here or not see his wife. Are you saying that he couldn't visit? He couldn't leave the country for a third country even to visit? I know that if he – I don't know a great deal about this area of law, but I have read that if one has withholding and not asylum and leaves the country, I don't believe one is guaranteed reentry. So I think it's at least risky for Mr. Colubi to leave the country. Do you understand the representation of the United States, as you just heard in open court, that he could do this? I may not have been listening carefully. I missed that. The – I think it is unlikely and risky that they could have periodic visits. In any event, I don't think it's a satisfactory policy for us to say husbands and wives should be able to travel to third countries to visit each other periodically. The – If I heard correctly, Mr. McLaughlin said that the purpose of the regulation was actually upside down. That is, I assume he would say if two spouses leave a country and come to this country, that to grant asylum to one but not to the other would not be appropriate, but not to grant asylum to one in order to bring the other one here. Do you have a comment on that? Let me say, Your Honor, that my recollection from reading the regulation is I didn't read it that way. Let me turn to it for a moment. The regulation says if the – it says, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her. So I read that as including the situation where the first spouse comes and seeks to bring the rest of the family along, which I know that as of 100 years ago was a common practice that families would send one representative over and hopefully bring the others later, and I believe still is. So I think it does speak to the rest of the family following, to use the words of the regulation, not just when they come together. I have only a few seconds left, so I think rather than making another point, I'll ask whether the Court has additional questions. No further questions. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn. All rise.
judges: O'scannlain, Rymer, Bybee